**FORDHAM UNIVERSITY, Plaintiff,**

v.

**Ronald H. BROWN, Secretary, United States Department of Commerce, Defendant.**

Civ. A. No. 93–2120 (CRR).

United States District Court, District of Columbia.

June 29, 1994.

686

Katrina Renouf and Margot Polivy of Renouf & Polivy, Washington, DC, for plaintiff.

Eric H. Holder, Jr., U.S. Atty., John D. Bates, Asst. U.S. Atty., and Sally M. Rider, Asst. U.S. Atty. Of Counsel: Stacia Davis LeBlanc and Brian Harris, U.S. Dept. of Commerce, for defendant.

Timothy B. Dyk and Eric Grant of Jones, Day, Reavis & Pogue, Washington, DC. Of Counsel: Theodore A. Miles, National Public Radio; Thomas E. Harvey, Sylvia S. Winik, and Pamela J. Brown, Corp. for Public Broadcasting, for amici curiae National Public Radio and the Corp. for Public Broadcasting.

Eugene F. Mullin of Mullin, Rhyne, Emmons and Topel, P.C., Washington, DC, for amicus curiae National Council of Churches.

Mark E. Chopko, Gen. Counsel, and Katherine G. Grincewich, Asst. Gen. Counsel, for amicus curiae U.S. Catholic Conference.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

Plaintiff Fordham University brings this suit to challenge a determination made by the Defendant Ronald H. Brown, Secretary of the Department of Commerce, that the Plaintiff's application for funding of certain broadcast facilities for its radio station is ineligible. The Government based this determination on the Plaintiff's weekly broadcast of Catholic Mass, and the Department's regulations barring the funding of sectarian programs. *See* 15 C.F.R. § 2301.5(d)(2)(xvi), § 2301.22(d) (1993). Fordham challenges this decision on the grounds that it violates the First Amendment; the Equal Protection Clause of the Fifth Amendment; Section 398 of the Communications Act of 1934, as amended, 47 U.S.C. § 398; the regulations governing eligibility under 47 C.F.R. § 2301.-09; the priorities for funding under 47 U.S.C. § 391 and 15 C.F.R. §§ 2301 *et seq.;* and the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb.

Before the Court are the parties' cross Motions for Summary Judgment. After careful consideration of the papers filed by the parties, the statements made by counsel at oral argument, the applicable law, and the entire record in this action, the Court shall grant the Defendant's Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

Radio station WFUV–FM is a noncommercial station licensed by the Federal Communications Commission ("FCC") to the Executive Committee of the Fordham Board of Trustees. WFUV broadcasts 24 hours a day, seven days a week, and is an affiliate of National Public Radio ("NPR") and American Public Radio ("APR"). It broadcasts music, news, information, ethnic service, and for the last 47 years, has broadcasted Catholic Mass from the Fordham University chapel on Sunday morning for one hour.

Because the radio station's transmission facilities are situated on the roof of a classroom building on campus, WFUV cannot meet the radiation standards of the FCC and must relocate those facilities. Accordingly, Fordham obtained a permit from the FCC to build a transmission tower and related equipment elsewhere on campus.

The National Telecommunications and Information Administration ("NTIA"), which operates within the Department of Commerce, administers the Public Telecommunications Facilities Program ("PTFP"). *See* 47 U.S.C. §§ 390 *et seq.* Through publication in the Federal Register on November 22, 1991, NTIA solicited proposals for applications for PTFP assistance for funding in 1992. The regulations governing the application process are contained in 15 C.F.R. § 2301 *et seq.* On March 5, 1992, Fordham submitted an application requesting $250,000 in federal funds to install a new transmission tower and antenna system, and $46,137 to rebuild its production control room. In its application, Fordham included a program guide which included the scheduling of a live broadcast of Catholic Mass from University Church on Sundays at 11:00 a.m. Additionally, the application also included an Assurance from the Director of Research that the applicant

> will not use or allow the use of the facilities for essentially sectarian purposes for as long as the Applicant possesses or uses the facilities, whether or not this period extends beyond the ten-year Federal interest period following the completion of this project.

Charles Estep, the PTFP Program Officer who reviewed Fordham's application, indicated on an Acceptance Processing Checklist that the application may not be acceptable for filing on the basis of the Sunday Mass, and recommended a legal determination regarding whether that program precludes the request for equipment.[1] On March 20, 1992,

---

1. The Plaintiff attempts to deny this review, arguing that it was not provided a copy of this document and lacks sufficient information to authenticate it. However, because the Acceptance Processing Checklist was properly included in the Government's Motion in accordance with Rule 56, the Court finds that the Plaintiff has not sufficiently controverted this fact.

the Government sent the Plaintiff a request for further information, including questions about such items as the breakout of tower costs reflecting nonapplicant usage. Fordham responded on March 25, 1992. On May 8, 1992, while the sectarian issue was being reviewed, Expert Panel favorably evaluated the application, and Mr. Estep assigned the tower and antenna a priority rating of 1B and the production equipment a priority rating of 4B, on a scale of 1A down to 5B. These ratings do not constitute guarantees or privileges by themselves, and are to be used for comparative purposes.

On July 22, 1992, after negotiations with PTFP's program officers, the Plaintiff submitted its final 1992 grant request for the amount of $286,698. According to the Verified Statement of Ralph M. Jennings, WFUV's General Manager, Mr. Estep had advised Mr. Jennings that the negotiations did not indicate a funding decision, and that one issue that remained to be resolved prior to such a decision was whether the Catholic Mass program made Fordham ineligible for NTIA/PTFP funding.

In a letter dated October 5, 1992, Fordham was informed that the NTIA was "unable" to fund Fordham's PTFP grant application. In its letter date October 9, 1992, Fordham responded that on October 7, 1992, the Federal Aviation Administration issued a "no hazard" determination for WFUV's proposed tower, and requested that NTIA reconsider its determination that Fordham's application was "ungrantable." By letter of October 19, 1992, Associate Administrator Dennis Connors of PTFP informed the Plaintiff that "at the time of the FY92 grant decisions, Fordham's application had not been classified as 'grantable' by the FCC," but that "[c]ertainly the Fordham application would be eligible for consideration if there is an award of deobligated funds." In his letter of January 6, 1993, Mr. Connors further informed the Plaintiff that NTIA had "completed its examination of the issue of sectarian programming and concluded that Fordham University's application to … PTFP would be eligible for funding," and encouraged Plaintiff to reapply.

Plaintiff submitted the required documentation and assurances to reactivate its 1992 grant request for 1993, and also filed a request that its application be funded from deobligated 1992 funds. The 1993 application received basically the same priority classification as the 1992 application, in that the transmission facility was rated 1B and the studio renovation was rated 4B. The Plaintiff included an additional element of the application, requesting a total of $15,774 of federal funding, which was rated 4A. On February 12, 1993, the Plaintiff again requested funding of its deferred 1992 application from deobligated funds, which it did not receive.

On June 1, 1993, Clarence L. "Larry" Irving was sworn in as the Assistant Secretary for Communications and Information. Mr. Irving told inquiring members of the New York congressional delegation that he was opposed to granting funds for a station which employed any sectarian programming whatsoever. On July 6, 1993, Fordham and PTFP staff representative Stuart Hallock negotiated a grant amount of $262,858. NTIA mandates that grant applications be submitted to the State Office of Educational Television and Public Broadcasting, and Plaintiff submitted its application to the New York State Office of Educational Television and Public Broadcasting. Upon review of Plaintiff's request, the New York State Office awarded it its highest priority designation of "Very Highly Recommended," one of only two New York PTFP applications to be so designated out of the nineteen that were submitted. These recommendations were forwarded to the NTIA for the NTIA's use in making decisions for the 1993 grants.

On or about September 4, 1993, Plaintiff learned that its 1993 PTFP application would not be funded. In a telephone conversation on September 9, 1993, between Larry Irving and Ralph Jennings, Mr. Irving said that he personally directed the denial of the Plaintiff's application based on WFUV's weekly broadcast of the Catholic Mass. Larry Irving further informed Mr. Jennings that the NTIA policy against awarding PTFP grants to stations broadcasting sectarian programming was "absolute," and that Plaintiff would

receive no funding until the religious service was removed from WFUV's schedule. On September 10, 1993, NTIA released a list of the 1993 PTFP grantees, which listed grants to projects of lower priority than that assigned to the projects in Plaintiff's application.

On October 13, 1993, the Plaintiff filed a Verified Complaint with this Court, and filed a Motion for a Temporary Restraining Order ("TRO") on October 14, 1993. On October 25, 1993, the parties filed a Joint Stipulation and Proposed Briefing Schedule, in which the Plaintiff withdrew its request for a TRO and the Defendant agreed that "should the plaintiff ultimately prevail on the merits, and be awarded the grant at issue in this case, the defendant will make available funds to fund the grant." Joint Stipulation and Proposed Briefing Schedule, Order of October 2, 1993, ¶¶ 1, 2.[2]

In his letter of November 3, 1993, Dennis R. Connor notified Fordham that it was "ineligible under the PTFP rules, which provide that a 'grantee may not use or allow the use of the Federally funded equipment for purposes the essential thrust of which are sectarian'. 15 C.F.R. 2301.22(d)." WFUV's program schedule did not change in any material respect between the time it submitted its 1992 PTFP application and the November, 1993 determination of its ineligibility.

## II. DISCUSSION

Fordham contends that the Government's determination of ineligibility is impermissible because it violates constitutional, statutory, and regulatory law. In making these arguments, the Plaintiff presents a broad attack implicating a variety of fundamental legal principles, and the Defendant responds on a similarly broad basis. However, in constructing their analyses, the parties stray from the actual controversy at bar. The

question of whether the NTIA could have funded WFUV without violating the Establishment Clause is not before the Court, nor are the questions of whether, or under what circumstances, the Government may keep a radio broadcast off the air based on its programming content. Rather, the central issue in this action is whether NTIA's attempt to comply with the First Amendment by prohibiting the funding of facilities for a religious radio show in a discretionary grant program violates regulatory, statutory, or constitutional law. The Court concludes that there is no genuine issue as to any material fact that the NTIA's determination of WFUV's ineligibility for PTFP assistance is within the bounds of the law, and therefore grants summary judgment for the Defendant.

### A. THE GOVERNMENT DID NOT EXCEED ITS STATUTORY AUTHORITY IN PROMULGATING THE CHALLENGED REGULATIONS.

■ The Public Telecommunication Financing Act of 1978, Pub.L. 95–567, 92. Stat. 2405 (1978), transferred the PTFP grant program from the Department of Health, Education, and Welfare to the control of the NTIA, which is within the Department of Commerce. The declared purpose of this program

is to assist, through matching grants, in the planning and construction of public telecommunications facilities in order to achieve the following objectives: (1) extend delivery of public telecommunications services to as many citizens of the United States as possible by the most efficient and economical means, including the use of broadcast and nonbroadcast technologies; (2) increase public telecommunications services and facilities available to, operated by, and owned by minorities and women; and (3) strengthen the capability of existing public television and radio stations to

2. This Stipulation has become a source of controversy for the parties. The relief sought by the Plaintiff in its Amended Complaint includes, in essence, a Court Order awarding the funding of its application. However, the Court notes that the challenged governmental action before it is Mr. Irving's determination of ineligibility. The parties stipulated that success on the merits is but one of two prerequisites for the defendant to

make available appropriated funds—the Defendant must also be awarded the grant. As stated by the controlling regulations, "[a] favorable preliminary determination of eligibility does not guarantee that the Agency will accept a future application for filing or award a subsequent grant." 15 C.F.R. § 2301.5(f)(3). Therefore, the issue of whether Fordham should be awarded the grant is not directly before the Court.

provide public telecommunications services to the public.

47 U.S.C. § 390.

Consonant with these goals and judicial guidance in federal funding, the NTIA has published a variety of rules and regulations that seek to implement Congress' objectives while maintaining a healthy separation between Church and State. In declaring Fordham's application ineligible, Larry Irving stated that he based his assessment of the ineligibility of Fordham's application on 15 C.F.R. § 2301.22(d), specifically entitled "Conditions attached to the Federal grant," which provides that a "grantee may not use or allow the use of the Federally funded equipment for purposes the essential thrust of which are sectarian." The regulations outlining the application procedures echo this provision, stating that an application must include an "Assurance that during the period in which the applicant possesses or uses the Federally funded facilities ... the applicant will not use or allow the use of the Federally funded equipment for essentially sectarian purposes." 15 C.F.R. § 2301.5(d)(2)(xvi).

Fordham asserts several challenges regarding the validity of the Department's issuance of these regulations. According to the Plaintiff, the Government issued its regulations without any explanation, and, by prohibiting grants for essentially sectarian purposes, went beyond the bounds of the underlying statute and impermissibly altered the statutory criteria for eligibility. However, in light of the extensive analysis and explanation rendered by the NTIA in formulating these regulations, the reasonableness of them, and the deference which this Court must give the agency's interpretation under *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Court rejects this argument and concludes that there is no inconsistency with the agency's statutory authority.[3]

The Plaintiff argues that the NTIA failed to offer an explanation for its proscriptive construction of the rule. Fordham cites *SEC v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 1711–12, 56 L.Ed.2d 148 (1978), for its contention that because this Court must speculate as to NTIA's basis for arriving at the conclusion that it reached, the Government's regulations are impermissible. Nonetheless, the Plaintiff does not dispute the applicability of *Chevron*, which states that "[t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)).

▪ In arguing that the NTIA has failed to offer an explanation for its reading of the rules, the Plaintiff is mistaken. On May 29, 1979, in the form of a Report and Order, the NTIA interpreted its final rule regarding the PTFP grant program. *See* Report and Order, 44 Fed.Reg. 30,898 (1979) ("Report and Order"). This Report and Order not only shows that the regulations are reasonable and consistent with the program's goals, but also indicates that the Government adopted a thoughtful approach to the problems inherent in delineating the parameters of funding only non-sectarian broadcasts:

> It is obvious that we are faced here with striking a difficult and delicate balance between competing considerations. We have a responsibility to see that this program is not turned to narrow, private purposes in contravention of the letter and intention of the Act, a responsibility which assumes Constitutional dimensions where use of facilities for sectarian purposes would violate the Establishment Clause of the First Amendment. However, we, as a government body, must also, to the extent possible, avoid becoming "superprogrammer" by inquiring into the content of particular programs....
>
> We will, as proposed in the Notice, accept for filing applications from otherwise-qualified entities which are related to religious

---

**3.** Although the Plaintiff has challenged regulations in a variety of ways, and triggered a *Chevron* analysis as a consequence of some of these

attacks, it has never asserted a claim under the Administrative Procedure Act.

groups, Churches, or other special interest groups. However, such applicants, must make in their applications clear showings that they will *never use PTFP-funded facilities to serve the special interests or sectarian purposes of their parent organizations or of any sectarian group.* The law requires this of us, and we cannot and would not shirk this responsibility. . . .

. . . .

Applicants with religious affiliations will be expected to show that both the applicant organization and its proposed services will be nonsectarian in nature. By "nonsectarian" we mean that they do not have the function or purpose of advancing or propagating a religious belief. *See Lemon v. Kurtzman,* 403 U.S. 602, [91 S.Ct. 2105, 29 L.Ed.2d 745] (1971); and *Tilton v. Richardson,* [403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) ]. . . .

In response to the concerns of those who feared we were banning all programs with religious themes, we stress that we are not doing so, and have changed the Rule to read: "In addition, facilities purchased in whole or in part with program funds may *never* be used for purposes, the essential thrust of which are sectarian." . . . *We have also applied the rule to all applicants, since Federal assistance to sectarian efforts violates the Establishment Clause regardless of who is involved.*

Report and Order ¶¶ 21, 22, 24, 26. (emphasis supplied). In a notable example of *Chevron* gap-filling, this Report and Order indicate that the promulgated regulations are an attempt to codify and implement the Constitution's requirements and existing jurisprudence. In the context of recent cases in which the judiciary has struck down agencies' enforcement of the First Amendment,

NTIA adequately explains its preference for a consistent policy over an ad hoc approach to First Amendment problems that its grant program may implicate, and therefore the Court must defer to this reasonable and long-standing policy choice.[4]

■ The Plaintiff contends that the NTIA's adoption of the "essentially sectarian purposes" restriction exceeds the limits of its statutory authority. Reading the provisions regarding applicant's assurances in its own favor, Fordham contends that the agency "chose . . . to require certification by applicants, and in so doing it elected to rely not on the personal opinions of politically appointed government officials but on the judgment of licensees as to whether the purposes to which they intend to put their federally funded equipment are 'essentially sectarian' or essentially secular." Plaintiff's Motion at 13.

The Court does not agree. According to the plain language of the statute, the governing regulations are well within the boundaries of the Secretary's administrative discretion. Through a variety of provisions, Congress emphasized the Secretary's authority to issue regulations requiring certain information and his discretion:

(a) Applications for grants

For each project for the construction of public telecommunications facilities there *shall be submitted* to the Secretary an application for a grant containing such information with respect to such project *as the Secretary may require,* . . .

. . . .

(e) Rules and regulations

The Secretary shall establish such rules and regulations as may be necessary to carry out this subpart, including rules and regulations relating to the order of priority

---

4. Fordham insists that this policy is inconclusive because the NTIA has failed to establish that it has established such a policy, and that "it seems probable that the action taken here has not been taken before." Defendant's Opposition at 3 n. 2. However, a Senior Officer responded: "To my knowledge, NTIA has never knowingly awarded a PTFP grant to a station intended to use the grant for facilities that would broadcast religious services." Supplemental Declaration of Richard P. Harland ¶ 3. Furthermore, Fordham can point to no inconsistency in the application of

this policy, and has never requested any discovery regarding this issue. In fact, even a determination of eligibility would likely violate the Administrative Procedure Act, 5 U.S.C. § 552(a), because it would indicate a change of policy that had not been properly implemented through the Federal Register and other appropriate channels. Furthermore, even if the NTIA had improperly funded other institutions in the past, this would not create a legitimate basis for Fordham to obtain similarly impermissible grants.

in approving applications for construction projects and relating to determining the amount of each grant for such projects. 47 U.S.C. § 392 (emphasis added). Fordham provides no legal support for its assertion that regulated entities should regulate themselves by determining their own compliance with the regulations. Furthermore, even if this interpretation did have a legal basis, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. Assurances are one aspect of the NTIA's overall administration of the program, and there is no reason why the agency should be forbidden from making sure that an Assurance comports with an applicant's programming schedule.

■ The Plaintiff also argues that the NTIA may not alter the statutory criteria for PTFP eligibility expressed in the Public Telecommunications Financing Act, 47 U.S.C. §§ 392, 393. The Plaintiff points out that 47 U.S.C. § 392(a) goes on to enumerate specific concerns for which an applicant must provide satisfactory assurances, such as assurances that the applicant is a public broadcast station and will make the most efficient use of the grant. Significantly, however, this listing in § 392(a) is preceded by the provision that the Secretary may require certain information. Similarly, 47 U.S.C. § 393(b) lists certain goals, but this follows the clear mandate of § 393(a) which states that "[t]he Secretary ... shall establish criteria for making construction and planning grants." Therefore, any specified concerns or criteria operate as a floor, and not a ceiling, to the Secretary's administration of this program.

■ In addition, Fordham argues that the PTFP's statutory origins do not provide for the conditioning of funding upon a governmental review of the program schedule of a PTFP applicant. More specifically, it cites 47 U.S.C. § 398, entitled "Federal interference or control," which prohibits the Government from "exercis[ing] any direction, supervision, or control over public telecommunications," and further states that "[n]othing in this section shall be construed to authorize [the Government] to exercise any direction,

supervision, or control over the content or distribution of public telecommunications programs and services." 47 § 398(a), (c). However, this provision is not violated for the same reasons that the First Amendment is not violated—no governmental entity tried to remove the Catholic Mass broadcast from the programming schedule, and a declaration of ineligibility for a grant from a discretionary program is not tantamount to "control" or "interference." *See infra* II.D.

■ Fordham also accuses the Government of subverting the statutory definition of "noncommercial educational station" to limit PTFP eligibility by improperly adding a proscription against sectarian programming to its regulatory definition section. Plaintiff points to 47 U.S.C. § 397(6), which defines "noncommercial educational station" to include those nonprofit entities entitled to FCC licensing, and to 47 U.S.C. § 397(14), which defines "public telecommunications services" to mean "noncommercial educational and cultural ... programs, and related noncommercial instructional or informational material...." According to the Plaintiff, the NTIA bootstraps its illegal ban against sectarian programming into the regulations by including in its definitions section of "Public telecommunications services" the identical definition set forth in Section 397(14), *but* which includes the additional sentence: "It does not include essentially sectarian programming." 15 C.F.R. § 2301.1.

The Plaintiff is off the mark in attempting to invalidate these regulations by challenging the lack of statutory authority for the Secretary to promulgate them. As established in *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2782, if a statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." In an admonition particularly appropriate to the Plaintiff's challenge here, a reviewing court "need not conclude that the agency construction was the only one it could permissibly have adopted." *Id.* at 843 n. 11, 104 S.Ct. at 2782. In light of the fact that the plain language of the statute is silent with respect to the subsidization of religious activity, and the "reasoned analysis" under

the interpretation of them, the Court defers to the Secretary's permissible construction of the statute. *See Motor Vehicle Mfrs. Assn. of United States v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

As demonstrated by the Report and Order issued in 1979, the Secretary issued these regulations in an attempt to balance a variety of statutory and constitutional objectives. *See* Report and Order ¶ 21. The Plaintiff presents no authority barring the Secretary's inclination to comply with the Constitution. In fact, he has a duty to implement such compliance: "A proper respect for both the Free Exercise and the Establishment Clause compels the State to pursue a course of 'neutrality' toward religion." *Board of Educ. of Kiryas Joel School Dist. v. Grumet,* —— U.S. ——, ——, 114 S.Ct. 2481, 2487, 129 L.Ed.2d 546 (1994) (quoting *Committee for Public Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 792–93, 93 S.Ct. 2955, 2975–76, 37 L.Ed.2d 948 (1973)). *See also Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976) ("The Court has taken the view that a secular purpose and a facial neutrality may not be enough, if in fact the State is lending direct support to a religious activity."); *Levitt v. Committee for Public Educ. & Religious Liberty,* 413 U.S. 472, 480, 93 S.Ct. 2814, 2819, 37 L.Ed.2d 736 (1973) ("[T]he State is constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination."); *Bowen v. Kendrick,* 487 U.S. 589, 615, 108 S.Ct. 2562, 2577, 101 L.Ed.2d 520 ("There is *no doubt* that the monitoring of [the Adolescent Family Life Act] grants is *necessary* to ensure that public money is to be spent in the way that Congress intended and in a way that comports with the Establishment Clause.") (emphasis added); *Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 554, 103 S.Ct. 1997, 2005, 76 L.Ed.2d 129 (1983) (Blackmun, J., concurring) (assuming that agency would continue administering statute "in keeping with Congress' limited purpose and with the IRS's duty to respect and uphold the Constitution.").

Furthermore, in light of the fact that the Report and Order interpreting these regulations were published in 1979, Congressional silence since that time buttresses the Government's argument. In deciphering legislative intent, courts have held that Congressional silence in reaction to agency interpretation provides at least tacit approval of that interpretation. As the Supreme Court has noted:

> To be sure, it may not always be realistic to infer approval of a judicial or administrative interpretation from congressional silence alone.... But once an agency's statutory construction has been "fully brought to the attention of the public and the Congress," and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.

*United States v. Rutherford,* 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 2476 n. 10, 61 L.Ed.2d 68 (1979) (citations omitted); *see also Young v. Community Nutrition Institute,* 476 U.S. 974, 983, 106 S.Ct. 2360, 2365–66, 90 L.Ed.2d 959 (1986) (stating that a "congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress") (quoting *NLRB v. Bell Aerospace, Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974)).

### B. THE APPLICABLE REGULATIONS WARRANT THE NTIA'S DETERMINATION OF WFUV'S INELIGIBILITY.

▮ The Plaintiff asserts a variety of challenges to these provisions on regulatory grounds. At the heart of these allegations, the Plaintiff charges that the NTIA breached its own rules in declaring the Plaintiff's application ineligible. The Plaintiff offers four related explanations for why funding its Sunday morning mass program is not in violation of the Defendant's own regulations. The Court finds none of these persuasive. In light of the plain language of the regulations, the regulatory scheme as a whole, and the administrative background of this case, these challenges must fail.

The essence of Fordham's first argument is estoppel—that it properly relied on the NTIA's rulings of October 19, 1992, and January 6, 1993, and that these rulings were dispositive. However, although some form of "affirmative misconduct" may give rise to estoppel against the Government, the circumstances in this case are nowhere extreme enough to do so. *See Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). Any such reliance or assumption of finality made by Fordham runs contrary to the applicable regulations and the procedural background of the application. These regulations specifically warn that

> [A]n applicant may, *at its own risk,* obligate non-Federal matching funds for the acquisition of proposed equipment.... If an applicant or recipient obligates Federal Award funds before the start date, *the Department may refuse to offer the award* or, if the award has already been granted, terminate the grant.

> . . . .

> The Department *will not make any payment* under an award, *unless and until the recipient complies with all relevant requirements imposed by this part.*

15 C.F.R. §§ 2301.16(a)(3), 2301.18(a). In addition, "NTIA possesses the discretionary authority to recommend awarding grants to eligible broadcast and nonbroadcast applicants whose proposals are so unique or innovative that they do not clearly fall within the priorities listed below." Appendix to 15 C.F.R. Part 2301, Special Applications and Priorities. Despite these conditional instructions, which clearly allowed for reconsideration or the correction of preliminary error as well as the prioritization of proposals for reasons beyond the priority list, Fordham insists that the funding of its grant request was a "virtual certainty." Plaintiff's Motion at 9. Because of these regulations, Fordham's awareness that the sectarian character of its programming was at issue, and the discretionary nature of the PTFP grant program which was based on a variety of factors, Fordham is not entitled to make nor rely upon such an assumption of funding.

■ Second, the Plaintiff and *amici* argue that the one-hour Mass should not meet the sectarian thresholds of 15 C.F.R. §§ 2301.-5(d)(2)(xvi), 2301.22(d). Reasoning that because these regulations refer to "essentially sectarian purposes" and "purposes the essential thrust of which are sectarian," the Plaintiff argues that it "must be assumed to reflect a purpose not to fund stations whose essential mission is sectarian," and that its broadcast of a religious service for one hour a week out of 168 programming hours demonstrates the secularity of its mission. Plaintiff's Motion at 17.

The Court does not follow along with the Plaintiff in making the assumption that the NTIA meant to look to the "essential mission" of a station. The NTIA meant to do precisely what it did—apply its regulations to the facts at hand. According to 15 C.F.R. § 2301.1, sectarian is defined as "that which has the purpose or function of advancing or propagating a religious belief." There is no doubt that the broadcast of a Catholic Mass program has a sectarian purpose, and therefore falls under this definition.

■ Furthermore, the Court must reject the Plaintiff's *de minimis* argument out-of-hand. Just as one cannot be just a little bit pregnant, the Supreme Court has emphasized that "*any* use of public funds to promote religious doctrines violates the Establishment Clause." *Bowen v. Kendrick,* 487 U.S. 589, 623, 108 S.Ct. 2562, 2582, 101 L.Ed.2d 520 (1988) (O'Connor, J., concurring) (emphasis in original). *See also Committee for Public Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 779 n. 36, 93 S.Ct. 2955, 2969 n. 36, 37 L.Ed.2d 948 (1973) ("In striking from the law the 20–year limitation, the [*Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) ] Court was concerned lest *any* federally financed facility be used for religious purposes *at any time.*"). Fordham's portrayal of its Catholic Mass program as a small part of a larger secular schedule does not change the fact that the Mass program has a sectarian thrust and is therefore ineligible for federal funding under the PTFP.

■ Third, the Plaintiff apparently argues that broadcasting the Catholic Mass is

not a sectarian activity, but merely the satisfaction of audience demand, including shut-ins. "[Fordham's] broadcast of a religious program is not a sectarian activity but simply the requisite response of any FCC licensee to the perceived needs of its audience, no different from broadcast of a public affairs, music or news program." Plaintiff's Reply at 6. However, the Plaintiff cannot point to any authority to support its theory that audience preference indicates the sectarian or non-sectarian content of a radio broadcast. Furthermore, Fordham undercuts this contention elsewhere in its filings, by arguing that the FCC encourages "religious programming," such as its broadcast of the Mass.

■ Fourth, Fordham argues that its non-sectarian status offers a shield from attacks that it is endorsing any particular religion.[5] Once again, the Court cannot accept Fordham's line of reasoning. An entity does not need to have a pervasively sectarian basis itself in order for one of its elements to have a sectarian purpose. Fordham's attempt to downplay the impact of a religious program in the context of the broader secularist environment of its .broadcast schedule or university environment leads to a mischaracterization of what its Sunday morning Mass really is. "The question in an as-applied challenge is not whether the entity is of a religious character, but how it spends its grant." *Bowen v. Kendrick,* 487 U.S. 589, 624–25, 108 S.Ct. 2562, 2582, 101 L.Ed.2d 520 (1988) (Kennedy, J., concurring). As Fordham argues elsewhere in its pleadings, Sunday morning Mass on WFUV is a 47–year–old institution that stands on its own two legs. Therefore, this weekly broadcast should be recognized as the religious service that it is in its own right, rather than a small, insignificant piece dwarfed by a larger whole.

## C. THE RELIGIOUS FREEDOM RESTORATION ACT OF 1993 DOES NOT PRECLUDE THE NTIA'S DETERMINATION OF INELIGIBILITY.

■ Apart from challenges to NTIA's own regulations and underlying statute, Fordham also argues that the Government's prohibition of federal funding of telecommunication equipment for sectarian programming is in violation of the Religious Freedom Restoration Act of 1993, Public Law 103–141, 42 U.S.C. § 2000bb. In making this claim for the protection of free exercise of religion, the Plaintiff bases this argument on the Act's requirement that the government demonstrate a compelling interest where a law substantially burdens·one's exercise of religion:

§ 2000bb–1. Free exercise of religion protected

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in the furtherance of a compelling governmental interest;  and

(2) is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation or defense in a

---

**5.** The District Court in *Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) found that the appellee colleges, all of which were affiliated with the Roman Catholic Church, were not "pervasively sectarian." This conclusion was based on a number of findings, including the finding that religious indoctrination was not a substantial purpose or activity;  that these colleges were characterized by a high degree of religious au-

tonomy;  that they taught theology only as a supplement to a liberal arts program;  and that while some classes began with prayer, there is no actual college policy of encouraging the practice. *Id.* at 755–56, 96 S.Ct. at 2349. While Fordham claims throughout its pleadings that it is not a sectarian institution, in light of the record before the Court and for the purposes of this Motion, the Court finds that Fordham is not pervasively sectarian.

judicial proceeding and obtain appropriate relief against a government. . . .

42 U.S.C. § 2000bb–1.

▇ However, the Defendant properly points to two reasons why these provisions are inapplicable here. First, the challenged regulations do not burden anyone's free exercise of religion, much less "substantially burden." In no way is a failure to subsidize a "burden"; WFUV can, and does, broadcast Mass as it always has.[6] Second, the NTIA's attempt to comply with the Establishment Clause does constitute a compelling interest. *See Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). The Court finds it curious that Plaintiff attempts to rely on *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) in advancing this argument. In that case, the Supreme Court ruled for a Seventh Day Adventist who had lost her eligibility for state unemployment compensation due to her refusal to accept Saturday work, because she was forced "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other." *Sherbert,* 374 U.S. at 404, 83 S.Ct. at 1794. The case at hand is most readily distinguishable from *Sherbert* because, as Fordham emphasizes throughout its papers, the Plaintiff is secular and is not broadcasting to further the Plaintiff's religious beliefs, in contrast to the direct and obvious exercise of religious beliefs by the plaintiff in *Sherbert.*

### D. THE NTIA'S DENIAL OF PTFP ELIGIBILITY IS CONSISTENT WITH THE ESTABLISHMENT CLAUSE.

▇ Defining the boundaries of the neutral area between the Establishment Clause and the Free Exercise Clause within which

Government may legitimately act must start with consideration of the cumulative criteria developed by courts over the years. *See Tilton v. Richardson,* 403 U.S. 672, 677–78, 91 S.Ct. 2091, 2095–96, 29 L.Ed.2d 790 (1971). Consequently, while a reviewing court must assess the three main concerns against which the Establishment Clause sought to protect—sponsorship, financial support, and active involvement of the government in religious activity—no single yardstick may be used to measure. *See id.*

▇ The landmark case of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) and its progeny provide the starting point for the analysis of this case under the Establishment Clause.[7] Government action challenged under this Clause must meet all three prongs of the *Lemon* test: (1) that it has a "secular purpose"; (2) that is has a "primary effect" that "neither advances nor inhibits" religion; and (3) that it not foster "excessive entanglement" of the state with religion. According to the Plaintiff, the Government bungled an unnecessary attempt to avoid problems with the Establishment Clause by violating the second and third prongs of this test.

In applying their analyses of the Establishment Clause to the facts of this case, the parties make broader arguments than what is actually before the Court. The Defendant contends that the Establishment Clause compels its regulations, that these rules are *mandated* by law. The Plaintiff responds that these regulations are *prohibited* by the Constitution. The Court agrees with neither, holding only that the Defendant *may* issue the regulations in question and make the consequent determination of ineligibility. Limiting this holding to the case before it, the Court emphasizes that it does not address the question of whether these regulations are required by law, whether there are

---

6. As stated in *Rust v. Sullivan,* 500 U.S. 173, 192, 111 S.Ct. 1759, 1771–72, 114 L.Ed.2d 233 (1991), the Supreme Court recognizes that the failure to fund a protected activity does not constitute a penalty on that activity. *See infra* at Section II.E.1.

7. Although it has not been overturned, the rigidity and consequent impracticality of *Lemon* has

diminished its utility over the years. *See Board of Educ. of Kiryas Joel Village v. Grumet,* —— U.S. ——, ——, 114 S.Ct. 2481, 2500, 129 L.Ed.2d 546 (1994) ("As the Court's Opinion today shows, the slide away from *Lemon*'s unitary approach is well under way.") (O'Connor, J., concurring in part and concurring in the judgment).

superior alternatives, or whether they would be problematic under other factual situations.

1. *DESPITE THE PLAINTIFF'S CLAIM THAT ITS RIGHT TO RELIGIOUS EXPRESSION IS CONSTRICTED, THE GOVERNMENT'S REGULATIONS DO NOT HAVE THE PRIMARY EFFECT OF INHIBITING RELIGION BECAUSE THERE IS NO IMPAIRMENT OF WFUV'S ABILITY TO BROADCAST AS IT CHOOSES.*

■■■ Fordham claims a violation of the primary effect test of *Lemon* on the grounds that NTIA's regulations inhibit religion. To support this assertion, the Plaintiff relies on *School Dist. of City of Grand Rapids v. Ball,* 473 U.S. 373, 389, 105 S.Ct. 3216, 3225–26, 87 L.Ed.2d 267 (1985), which states that where government action "fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations" and "conveys a message of government . . . disapproval of religion, a core purpose of the Establishment Clause is violated." [8]

The Court finds that the Government's regulations do not inhibit religion. As stated by the Supreme Court, " '[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a "penalty" on that activity.' " *Rust v. Sullivan,* 500 U.S. 173, 192, 111 S.Ct. 1759, 1772, 114 L.Ed.2d 233 (1991) (quoting *Harris v. McRae,* 448 U.S. 297, 317 n. 19, 100 S.Ct. 2671, 2688 n. 19, 65 L.Ed.2d 784 (1980)); *see also Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 546, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983) ("We again reject the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.' ") (quoting *Cammarano v. United States,* 358 U.S. 498, 515, 79 S.Ct. 524, 534–35, 3 L.Ed.2d 462 (1959) (Douglas, J., concurring)). Simply put, the ineligibility determination does not constitute a penalty. The record before this Court therefore indicates that the Government has not unconstitutionally inhibited the religious activity of the Plaintiff.

Ironically, the *Grand Rapids* decision cited by the Plaintiff lends support to the validity of the NTIA regulations, as do a variety of other high court decisions. In *Grand Rapids,* the Supreme Court held that a school district's shared time and community education programs had the "primary or principal" effect of advancing religion. That ruling was based on a variety of reasons, including the impermissibility of subsidizing in effect the religious functions of sectarian schools. *See id.* at 397, 105 S.Ct. at 3229–30. While the instant case is readily distinguishable, most obviously because of Fordham's nonsectarian character, a comparison is important because the Government issued the regulations precisely to avoid the disallowed subsidization. Additionally, the Plaintiff's quotation from *Grand Rapids* was incomplete, because that case warned not only against disapproval of religion, but also that "[i]f this identification conveys a message of government *endorsement or* disapproval of religion, a core purpose of the Establishment Clause is violated." *Id.* at 389, 105 S.Ct. at 3225 (emphasis added). Perhaps most significantly, that case went on to reject definitively any form of *de minimis* standard with regard to Government funding of sectarian activity, ruling that "there is no principled basis on which this Court can impose a limit on the percentage of the religious schoolday that can be subsidized by the public school." *Id.* at 397, 105 S.Ct. at 3229.

■■■ The guidelines for "primary effect" violations set forth in *Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973) further support the NTIA regulations. The Supreme Court declared the following test to determine "primary effect":

Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious

---

8. The desire for reconsideration of *Grand Rapids* in the concurring and dissenting Opinions in the Supreme Court's recent decision in *Board of Educ. of Kiryas Joel Village School District v. Grumet,* —— U.S. ——, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) clearly indicates that *Grand Rapids* is on unstable ground. However, that case still remains good law, and its precedential value is far from dispositive in this Court's review of NTIA's ineligibility determination.

mission *or when it funds a specifically religious activity in an otherwise substantially secular setting.*

*Id.* at 743, 93 S.Ct. at 2874; *see also Bowen v. Kendrick,* 487 U.S. 589, 621, 108 S.Ct. 2562, 2581, 101 L.Ed.2d 520 (quoting the latter portion of this provision before stating "it would be relevant to determining, for example, whether the Secretary has permitted AFLA grantees to use materials that … are designed to inculcate the views of a particular faith."). Accordingly, as the Government stated in the Report and Order, the challenged regulations are a product of the Secretary's efforts to comply with Supreme Court jurisprudence in this area, and to avoid the improper funding of religious activity, regardless of the degree or existence of Fordham's sectarianism.

Although this Court is not addressing the issue of whether every program must maintain a wall between church and state in the same manner as the Secretary did, several other Supreme Court cases also lend implicit support for the constitutionality and permissibility of these regulations. These cases, on which both sides rely, do not support the Plaintiff's claims because they either deal with a generally accessible governmental program distributing benefits neutrally, or, more typically, because they address the contours of improper promotion of religious activity, but not the threshold for impermissible inhibition.

In *Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 739, 96 S.Ct. 2337, 2341, 49 L.Ed.2d 179 (1976), the Supreme Court upheld Maryland's statutory scheme providing for noncategorical grants to private colleges subject to the qualification that funds are "not to be used for 'sectarian purposes.'" Although there are several differences between *Roemer* and the instant case, including the specificity of the PTFP grant, the Supreme Court compared Maryland's no "sectarian purposes" provision to *Hunt*'s requirement that state funds not be used to support "specifically religious activity," and concluded that colleges are expected to "give a wide berth to 'specifically religious activity,' and thus minimize constitutional questions." *Roemer,* 426 U.S. 736, 760, 96 S.Ct. 2337,

2351. Furthermore, such minimization is the stated and apparent object of this portion of the NTIA guidelines. *Roemer* then noted with approval that regulations were adopted to conform to these constraints, prohibiting recipient institutions from using state funds for "sectarian purposes" such as the support of religious instruction or other activities of a religious nature. *Id.* at 761 n. 22, 96 S.Ct. at 2351 n. ·22.

Similarly, in *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), the Supreme Court affirmed the general constitutionality of a federal statute which provided federal construction grants for college and university facilities, excluding any facility used "for sectarian instruction or as a place for religious worship, or … primarily in connection with any part of the program of a school or department of divinity." In fact, the only part of the statute which the Court found unconstitutional was a 20-year restriction on the exclusion of sectarian uses. Specifically, the Court struck down the part of the statute which allowed this restriction to expire, on the basis that this provision is "inadequate to ensure that the impact of the federal aid will not advance religion." *Id.* at 682, 91 S.Ct. at 2098. Moreover, the Court's basis for concluding that the grants did not have a "primary effect" included the District Court's finding that "there had been no religious services or worship in the federally financed facilities, … and that they had been used solely for nonreligious purposes." *Id.* at 681, 91 S.Ct. at 2097. The Supreme Court's acceptance and requirement of the restrictions in *Tilton* demonstrate that the substantially similar regulations here are permissible under the First Amendment.

The Plaintiff relies heavily on *Witters v. Washington Dept. of Servs. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). In that case, the Court rejected the claim that Washington's award of vocational rehabilitation aid to finance a blind college student's theological training advanced religion inconsistently with the Establishment Clause. *Id.* at 489, 106 S.Ct. at 752–53. Fordham argues that WFUV's decision to air a Catholic service is quite similar to the

decision made by the student in *Witters* to study theology, and that this is a "genuinely independent and private choice." *Id.* at 487, 106 S.Ct. at 751.

However, that holding relied on several factors which are not present in this case. For example, aid under the Washington program was paid directly to the student, who then transmitted it the educational institution of his or her choosing. Here, the NTIA program funds the institution directly, based on a written application which includes supposed assurances of how it will spend the funds—in this case, the program guide included in Fordham's application shows that a portion of any Government grant would go toward the broadcast of religious services. In addition, unlike the instant case in which the Plaintiff seeks a subsidy of which a part would help to broadcast Catholic Mass, the *Witters* Court noted that nothing in the record indicated that any significant portion of the aid from the Washington program would flow to religious education or activity. Thus, the factors which convinced the Supreme Court to find an attenuated link between the State and the school are glaringly absent here.[9]

Fordham's citation of *Zobrest v. Catalina Foothills School Dist.,* —— U.S. ——, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) as a parallel to the instant case is similarly unfounded. A deaf child and his parents filed suit in *Zobrest* to challenge a school district's refusal to provide a sign-language interpreter to accompany the child to classes at a Catholic high school. Once again, that case is distinguishable because it revolved around a program providing benefits to every qualified handicapped student that applied, in contrast to the limited pool of funds in this case which are conditionally available not to all qualified applicants, but only to certain eligible entities which happen to obtain funding. More importantly, like *Witters,* the program in *Zobrest* channeled aid to the student and his parents, rather than directly to the school. Unlike the program beneficiaries in those two cases who relayed government funding

to third-party schools, the PTFP grants do not "flow[ ] to religious institutions … only as a result of the genuinely independent and private choices of aid recipients," *Zobrest,* —— U.S. at ——, 113 S.Ct. at 2467 (quoting *Witters v. Washington Dept. of Serv. for the Blind,* 474 U.S. 481, 487, 106 S.Ct. 748, 751, 88 L.Ed.2d 846 (1986)), but go straight to the entity broadcasting the Mass. "In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear from our cases that direct aid in whatever form is invalid." *Committee for Public Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 780, 93 S.Ct. 2955, 2969, 37 L.Ed.2d 948 (1973).

## 2. THE NTIA'S REGULATIONS PROHIBITING SECTARIAN USE OF FEDERALLY FUNDED EQUIPMENT DO NOT EXCESSIVELY ENTANGLE THE GOVERNMENT WITH RELIGION.

With respect to entanglement, Fordham declares that "NTIA's policy with respect to sectarian broadcasting, as presently interpreted, is a manifest nightmare." Plaintiff's Opposition, at 28. The Plaintiff portrays the Government's policy described in ¶ 20 of the Report and Order, prohibiting funding facilities for "purposes, the essential thrust of which are sectarian" without banning all religious programming, as being unworkable and inappropriate. The Plaintiff further asserts that "the determination of whether religious music was presented 'in an educational or cultural context' rather than a 'sectarian' one would appear to involve a high degree of ecclesiastical scholarship on the part of NTIA," and even accuses the NTIA of adopting a "self necessitated role as the Grand Inquisitor of sectarian programming." Plaintiff's Opposition at 29, 32. More specifically, the Plaintiff contends that the NTIA's rules entangle it in complex and inappropriate issues of determining when programs fall within its proscriptions, and that these determinations are best left to the regulated institutions.

**9.** The *Witters* Court also emphasized that the state court could reopen the factual record on remand, which would allow that court to address

issues concerning impermissible relationships between Church and State. *See id.* at 489, 106 S.Ct. at 752–53.

Notwithstanding the Plaintiff's hyperbolic criticism, by raising the entanglement issue, the Plaintiff once again misconstrues what is at issue here. In its essence, entanglement is a procedural problem, involving such processes as assurances, approval, expenditure and review. *Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 755, 776, 96 S.Ct. 2337, 2432, 49 L.Ed.2d 179 (1976). The Government's decision to implement a bright-line policy against federal support of religious broadcasting is a reasonable and principled approach to avoid the potential inconsistencies of a *de minimis* standard. The *de minimis* approach endorsed by the Plaintiff would lead to continual monitoring of a recipient's programming and constant, unnecessary line-drawing. Rather than making itself a "Grand Inquisitor," the Government's approach avoids case-by-case evaluation of programming and actually minimizes entanglement.

In fact, any entanglement from the Government regulations a necessary product of the Supreme Court's limitations. *School Dist. of the City of Grand Rapids v. Ball,* 473 U.S. 373, 395, 105 S.Ct. 3216, 3228–29, 87 L.Ed. 2d 267 (1985). In *Bowen v. Kendrick,* 487 U.S. 589, 615, 108 S.Ct. 2562, 2577–78, 101 L.Ed.2d 520 (1988), the Supreme Court explicitly recognized this "Catch–22" problem inherent to the entanglement prong: "the very supervision of the aid to assure that it does not further religion renders the statute invalid." [10] Without finding an entanglement violation, *Bowen* allowed Government supervisors a tremendous amount of leeway in ensuring that religious purposes are not being furthered:

> There is accordingly no reason to fear that the less intensive monitoring involved here will cause the Government to intrude unduly in the day-to-day operation of the religiously affiliated AFLA grantees. Unquestionably, the Secretary will review the programs set up and run by the AFLA grantees, and undoubtedly this will involve a review of, for example, the educational materials that a grantee proposes to use.

The Secretary may also wish to have Government employees visit the clinics or offices where AFLA programs are being carried out to see whether they are in fact being administered in accordance with statutory and constitutional requirements. But in our view, this type of grant monitoring does not amount to "excessive entanglement," at least in the context of a statute authorizing grants to religiously affiliated organizations that are not necessarily "pervasively sectarian."

*Bowen* at 616, 108 S.Ct. at 2578. In light of this determination, the Government's monitoring of the PTFP—which involves activities such as checking program schedules to make sure that sectarian purposes are not being furthered and that Assurances are accurate—falls far short of excessive entanglement.

### E. BECAUSE THE PLAINTIFF'S RIGHTS TO CONTINUE TO BROADCAST CATHOLIC MASS IS NOT IMPAIRED, PLAINTIFF'S RIGHT TO FREE SPEECH UNDER THE FIRST AMENDMENT IS NOT VIOLATED.

The Plaintiff also brings a Free Speech challenge to the Government regulations. In essence, Fordham claims that the NTIA's declaration of its ineligibility for a PTFP grant deprives it of its right to express itself, and that the NTIA is impermissibly meddling with the content of its broadcast. Due to the fact that a denial of a grant application does not abridge the Plaintiff's right to broadcast Mass, and the critical distinction between funding and access, the Court must grant the Defendant's Motion for Summary Judgment on this issue.

### 1. BECAUSE THIS CASE REVOLVES AROUND THE PLAINTIFF'S ELIGIBILITY FOR A COMPETITIVE GRANT PROGRAM, THE PLAINTIFF'S RELIANCE ON PUBLIC FORUM CASES IS MISPLACED.

In charging that the Government's regulations effectively suppress its right to

---

10. However, the Dissent attacked this characterization as being "easy." *Bowen v. Kendrick,* at 649, 108 S.Ct. at 2595 ("To the extent any metaphor is helpful, I would be more inclined to characterize the Court's excessive entanglement decisions as concluding that to implement the required monitoring, we would have to kill the patient to cure what ailed him.") (Blackmun, J., dissenting).

Free Speech, Fordham understates the distinction between not subsidizing a viewpoint and banning it, as well as the importance of public fora in the Supreme Court's rulings in this area. In denying this challenge, this Court finds most persuasive the Supreme Court's forceful distinction between the Government's choice not to fund a program and the actual denial of a right:

> The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternate program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other. "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." [*Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549, 103 S.Ct. 1997, 2003, 76 L.Ed.2d 129 (1983) ]. "A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." [*Harris v. McRae*, 448 U.S. 297, 317, n. 19, 100 S.Ct. 2671, 2688 n. 19, 65 L.Ed.2d 784 (1980).]

*Rust v. Sullivan*, 500 U.S. 173, 193, 111 S.Ct. 1759, 1772, 114 L.Ed.2d 233 (1991) (citations omitted). In rejecting the petitioners' claim that the regulations issued by the Secretary of Health and Human Services imposing conditions such as prohibiting grant recipients under Title X of the Public Health Service Act from engaging in abortion counseling as a method of family planning, the *Rust* Court ruled that "[w]ithin far broader limits than petitioners are willing to concede, when the government appropriates public funds to establish a program it is entitled to define the limits of that program." *Id.* at 194, 111 S.Ct. at 1773; *see Tipton v. University of Hawaii*, 15 F.3d 922, 926 (9th Cir.1994) ("Between the two extremes of denying religious groups all financial support, on the one hand, and subsidizing indisputably religious activities, on the other, the University has wide latitude in adopting a funding policy to allocate the limited resources available to promote students' extracurricular activities.").

In attempting to support its claim, Fordham cites *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) for its contention that the NTIA may not single out religious worship as a target for prohibition. In *Widmar*, the Supreme Court examined a state university's regulation barring the use of campus buildings or grounds " 'for purposes of religious worship or religious teaching.' " *Id.* at 265, 102 S.Ct. at 272. A religious group registered with the university challenged that regulation on the grounds that it violated their rights to free exercise of religion and freedom of speech. The issue in that case was "whether a state university, which makes its facilities generally available for the activities of registered student groups, may close its facilities to a registered student group desiring to use the facilities for religious worship and religious discussion." *Id.* at 264–65, 102 S.Ct. at 272. Emphasizing that its basis for the decision was narrow, the Court held that "[h]aving created a forum generally open to student groups," the university's exclusionary policy sought to enforce a content-based exclusion and violated content-neutral principles of free speech. *Id.* at 277, 102 S.Ct. at 278.

The underlying facts in *Widmar* and that Court's reliance on them are distinguishable from the action before the Court. Most importantly, the NTIA did not create any "forum generally open" to certain groups. "The provision of benefits to so broad a spectrum of groups is an important index of secular effect," *id.* at 274, 102 S.Ct. at 277, and no such indication of secularity exists here. The PTFP does not distribute access generally across a broad spectrum; rather, many qualified groups may be denied grants for a variety of reasons. In response to concerns that terms such as "public forum" and "compelling state freedom" may undermine academic freedom, *Widmar* reiterated that "[o]ur holding is limited to the context of a public forum created by the University itself." *Widmar*, 454 U.S. at 277, n. 20, 102 S.Ct. at 278, n. 20. The importance of this constraint where a policy of exclusion exists renders *Widmar* inapplicable to a discretionary application program such as the PTFP. As a consequence, this Court shall not engage in a

compelling interest/public forum analysis. *See id.* at 269–70, 102 S.Ct. at 275 ("In order to justify discriminatory exclusion from a *public forum* based on the religious content of a group's intended speech, the University must therefore satisfy the standard of review appropriate to content-based exclusions.") (emphasis added).

Fordham's reliance on *Arkansas Writers' Project v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) is similarly misplaced. Fordham again argues that its station's religious broadcast was unfairly singled out for ineligibility, in the same manner that Arkansas' tax scheme unconstitutionally exempted publications devoted exclusively to religion, but not those dealing with a variety of subjects. However, the *Rust* Court's basis for distinguishing the *Arkansas Writers' Project* from the facts in *Rust* is the same here. Arkansas violated the First Amendment by selectively taxing magazines based on content, and applying different rules to different entities on that basis. *Arkansas Writers' Project,* 481 U.S. at 229, 107 S.Ct. at 1727–28. In the instant case, no single group is being targeted, in that the rules apply to all; rather, "we have here not the case of a general law singling out a disfavored group on the basis of speech content, but a case of the Government refusing to fund activities, including speech, which are specifically excluded from the scope of the project funded." *Rust v. Sullivan,* 500 U.S. 173, 194–95, 111 S.Ct. 1759, 1773 (1991).

The Plaintiff seems intent on trying to draw the Court into a general discussion of Government's difficulties in handling religious issues.[11] However, in underscoring the problems in delineating speech from worship, the Plaintiff makes a straw man argument. Here, there is no potential for deprivation of

worship, because there is no deprivation of speech—the issue is not whether WFUV may broadcast freely or even whether its listeners (who are *not* a party to this litigation) may worship as they choose, but whether the Government may seek to follow the parameters of the Establishment Clause in funding certain broadcast facilities.

*2. JUDICIAL PRONOUNCEMENTS OF THE FCC'S LICENSING REQUIREMENTS PROVIDING BROADCASTERS WITH THE RIGHT TO CHOOSE THEIR PROGRAMMING DO NOT PERTAIN TO THE DISCRETIONARY FUNDING PROGRAM IN THIS CASE.*

■ Fordham alleges that the NTIA's decision facially violates the First Amendment. According to Fordham, the Government's determination of ineligibility creates a "direct restraint" on the Plaintiff's right of program selection. In support of this argument, the Plaintiff relies on *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 389, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969), *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), and *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 800, 98 S.Ct. 2096, 2114–15, 56 L.Ed.2d 697 (1978) for propositions regarding the FCC's licensing of broadcasters and the requirement that applicants for licenses must demonstrate that their broadcasts would serve the "public interest." According to Plaintiff and *amici,* they are caught in the middle between the FCC's encouragement of religious programming by broadcasters and the NTIA's rules prohibiting such programming, and they reason that the FCC approach should control the NTIA grants.

---

**11.** For example, the Plaintiff raises a series of questions in an apparent attempt to demonstrate the slippery-slope problems of governmental determinations of sectarianism:

Is it, for example, permissible to present, as public television is wont to do at Christmas time, a carol service from the National Cathedral? And if so, is that because Christmas is a cultural rather than a religious celebration? And is that a determination to be made by NTIA? And what about the content of the music itself? What if, as some religious radio

stations do, a recipient were to broadcast songs which had a tendency to preach or proselytize? Would it be cultural or sectarian to broadcast a funeral? And if it is permissible to play Mozart's Requiem because it is cultural, does it become sectarian if it is played because someone has died?

Plaintiff's Opposition at 29–30. Once again, however, the Court notes that there is one discrete governmental action before the Court, and that speculation on hypothetical determinations would be inappropriate.

The Plaintiff strings together various quotes from Supreme Court cases to make its argument. The Plaintiff points to constraints on the FCC, such as 47 U.S.C. § 326, which prohibits the FCC from adopting rules "which shall interfere with the right of free speech by means of radio communication," and also points to sweeping statements by the Supreme Court in this area. *See National Broadcasting Company v. United States*, 319 U.S. 190, 206, 63 S.Ct. 997, 1005, 87 L.Ed. 1344 (1943) ("The licensee is obliged to reserve to himself the final decision as to what programs will best serve the public interest."); *Columbia Broadcasting Systems, Inc. v. FCC*, 453 U.S. 367, 395, 101 S.Ct. 2813, 2829, 69 L.Ed.2d 706 (1981) ("A licensed broadcaster is 'granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened by enforceable public obligations.'" (quoting *Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994, 1003 (D.C.Cir.1966))). Applying these FCC cases, the Plaintiff asserts that the disputed regulation banning protected speech is illegal, absent a justification that making this grant would cause greater harm to another compelling governmental interest.

However, the Defendant persuasively responds to these assertions that the disparate responsibilities and mandates of the FCC and NTIA prevent these two governmental entities from being lumped together. *See* Defendant's Reply at 10 ("Money is fungible, spectrum is unique.") The FCC's purpose is to broaden the broadcasting spectrum by permitting and encouraging a diversity of communication as it regulates commerce in communication. *See* 47 U.S.C. § 151. While

denying a license would keep a party off the air, a determination of ineligibility to compete for a grant from a limited pool of money does not comparably diminish an applicant's constitutional rights nor does it restrain a licensee's program choice. Furthermore, as shown by the preliminary discussions between the parties, there is no indication that Fordham would be ineligible for funding of equipment that is not used to broadcast the Church service.[12] Therefore, because WFUV has broadcast a Sunday morning Catholic Mass for nearly half a century and shows no signs of stopping in the near future, and because *Red Lion* line of cases are rooted in the FCC's licensing of stations and are irrelevant to federal grants within a discretionary program, the NTIA regulations do not impose any Free Speech limitations upon the Plaintiff.

### F. THE FACT THAT THE NTIA REGULATIONS APPLY TO ALL REGULATED ENTITIES WITHOUT DISCRIMINATION SHOWS THAT THESE REGULATIONS DO NOT VIOLATE THE EQUAL PROTECTION CLAUSE.

■ The Plaintiff also alleges that the Defendant's stated reasons for denying the Plaintiff's PTFP application violates the Plaintiff's Fifth Amendment right to equal protection. According to Fordham, NTIA's policy on grants violates the prohibition on any government agency to exercise any "direction, supervision, or control" over recipients' programming, 47 U.S.C. § 398, and therefore unconstitutionally distinguishes among otherwise eligible applicants solely on the basis of their program schedules.

> By requiring that the Title X grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has, consistent with our teachings in *League of Women Voters* and *Regan*, not denied it the right to engage in abortion-related activities. Congress has merely refused to fund such activities out of the public fisc, and the Secretary has simply required a certain degree of separation from the Title X project in order to ensure the integrity of the federally funded program. *Rust v. Sullivan*, 500 U.S. at 198, 111 S.Ct. at 1775.

12. As the Defendant indicates in its papers, its determination of ineligibility does not preclude Fordham from applying for a PTFP grant that would aid facilities that are not used for sectarian purposes. As the Supreme Court expressly recognized in *FCC v. League of Women Voters of California*, 468 U.S. 364, 400, 104 S.Ct. 3106, 3128, 82 L.Ed.2d 278 (1984) and *Rust v. Sullivan*, 500 U.S. 173, 197, 111 S.Ct. 1759, 1774, 114 L.Ed.2d 233 (1991), because the separation of organizations or other administrative divisions offer possibilities allowing various organizations to receive state money, First Amendment activities have not been infringed. More specifically, as stated in *Rust*:

The Court cannot agree. *Rust v. Sullivan* clearly shows the premise that a legitimate decision by the Government to award a grant to one group over another does not necessarily discriminate: "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternate program which seeks to deal with the problem in another way." *Rust,* 500 U.S. at 193, 111 S.Ct. at 1772. There is no evidence that the Government applies its eligibility standards differently to different groups— the regulations clearly state that no institution is eligible for a grant that is used for sectarian purposes, regardless of that institution's religious affiliation or degree of secularity.

The Ninth Circuit's recent decision in *Tipton v. University of Hawaii,* 15 F.3d 922 (9th Cir.1994) further supports the conclusion that the Government did not violate the Equal Protection Clause. In *Tipton,* the Ninth Circuit upheld the University of Hawaii's policy not to grant any funds " 'that are intended to or actually benefit any sectarian program or activity of a [University Registered Organization ("URO")].' " *Tipton,* 15 F.3d at 924. *Tipton* echoed *Rust*'s acknowledgement of a university's wide latitude in adopting a funding policy where resources are limited, concluding that "[t]he fact that different criteria might have been adopted does not invalidate the program actually adopted by the University," and that the equal application of the funding criteria meant that the policy was constitutional. *Tipton,* at 926. Therefore, *Rust* and *Tipton* indicate that because the NTIA regulations were equally applied to both secular and religious applicants, and do not alter the neutrality of its underlying statute, there is no violation of the Equal Protection Clause.

### III. CONCLUSION

For all the reasons previously stated, the Court shall grant the Defendant's Motion for Summary Judgment and deny the Plaintiff's Motion for Summary Judgment. The Court rejects the Plaintiff's contention that the NTIA's regulations are contrary to law, as well as the Defendant's response that they are mandated by law, holding instead that these regulations are permissible under statutory, regulatory, and constitutional law. The Court shall enter an Order of even date herewith in accordance with this Memorandum Opinion.

### ORDER

Upon careful consideration of the parties' Motions, all the papers filed in this case, and the applicable law, and for the reasons articulated in the Opinion of the Court of even date herewith, it is, by the Court, this 28th day of June, 1994,

ORDERED that the Defendant's Motion for Summary Judgment shall be, and hereby is, GRANTED, and, therefore, the regulations at issue in this case, and the interpretation thereof by the Defendant, are consistent with the law and Constitution of the United States; and it is

FURTHER ORDERED that the Plaintiff's Motion for Summary Judgment shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that all other motions shall be and hereby are rendered and declared MOOT; and it is

FURTHER ORDERED that the above-captioned case shall be, and hereby is, DISMISSED from the dockets of this Court.